UNITED STATES, Appellant,

v.

Clay H. BERRI, Machinery Technician
Second Class, U.S. Coast
Guard, Appellee.

No. 65,087.
CG 921.

U.S. Court of Military Appeals.

Argued March 6, 1991.

Decided Sept. 30, 1991.

For the Accused: *Lieutenant G Arthur Robbins* (argued).

For the United States: *Lieutenant Commander Michael J. Devine* (argued).

## Opinion of the Court

COX, Judge:

The issue before us on certification by the General Counsel, Department of Transportation, concerns the correctness of the Court of Military Review's determination that certain psychiatric testimony adduced by the defense should have been considered by the factfinders on the question of the accused's "specific intent." Art. 67(a)(2), Uniform Code of Military Justice, 10 USC § 867(a)(2)(1989). We hold that the Court of Military Review did not err, and we affirm.

### I

The accused was convicted of attempted murder, maiming, and assault intentionally inflicting grievous bodily harm.[1] Each of these are "specific intent" crimes. Prior to trial, defense counsel gave notice of his intent to present a lack-of-mental-responsibility defense. RCM 701(b)(2), Manual for Courts–Martial, United States, 1984. In addition, counsel sought a preliminary ruling on admissibility of psychiatric testimony to rebut specific intent. The military judge, generally anticipating our opinion in *Ellis v. Jacob*, 26 MJ 90 (CMA 1988), agreed that "specific intent" could be attacked with psychiatric evidence. *See also United States v. Cameron*, 907 F.2d 1051

(11th Cir.1990); *United States v. Pohlot*, 827 F.2d 889 (3d Cir.1987).

In their case-in-chief, the defense, as advertised, produced two well-known psychiatrists. Primarily, their testimony was oriented toward the affirmative defense of lack of mental responsibility; their ultimate conclusions were couched in terms of the accused's inability "to appreciate the nature and quality or the wrongfulness of" his acts at the time of the offenses. *See* Art. 50a, UCMJ, 10 USC § 850a; *Ellis v. Jacob, supra.* The testimony was received without restriction in this regard, and there is no contention that the judge's instructions were deficient in this respect. In view of the findings, it is apparent that the members felt the defense failed to carry its burden of persuasion on the matter.[2] Neither party here claims error regarding the defense of lack of mental responsibility.

After receiving the psychiatric testimony, however, the judge concluded that it did not, as given, rebut specific intent. In his instructions, therefore, he effectively barred the members from considering the expert evidence on *mens rea*. Left for the members to consider on specific intent were lay impressions and descriptions of the accused's conduct, appearance, demeanor, and statements—before, during, and after the shootings—together with such inferences as might be drawn therefrom.

On appeal, the Court of Military Review reversed, holding that the expert testimony adduced was indeed germane to specific intent. Thus, that court deemed the instructions prejudicially deficient. Due to this error, the court below concluded that no conviction involving specific intent could stand. Accordingly, the court affirmed only a single, lesser-included, "general intent" charge of assault with a dangerous weapon.[3] Art. 128, UCMJ, 10 USC § 928.

1. In violation of Articles 80, 124, and 128, Uniform Code of Military Justice, 10 USC §§ 880, 924, and 928, respectively. He was sentenced to a dishonorable discharge, confinement for 17 years, total forfeitures, and reduction to E–1. The convening authority approved the sentence.

2. *See* Art. 50a(b), UCMJ, 10 USC § 850a(b) and text *infra.* In addition to the defense evidence

on lack of mental responsibility, the court members had before them considerable countervailing testimony, both expert and lay, marshaled by the prosecution.

3. At trial, the defense did not contend that the psychiatric testimony would have rebutted "general intent," and neither the military judge nor the Court of Military Review have discussed the

All other findings were set aside; a rehearing was authorized with respect to the stricken findings and the sentence. 30 MJ 1169, 1174 (1990).

We hold that the Court of Military Review did not, as a matter of law, err, and we affirm.[4]

## II

The crime facts were succinctly summarized by the court below:

> The evidence reveals that appellant, after exchanging angry verbal taunts with a shipmate early one morning aboard ship, confronted that shipmate later in the evening in the parking lot of a motel where the victim and other crewmembers were quartered. The appellant was armed with a twelve gauge shotgun. When the shipmate attempted to flee, appellant fired the shotgun hitting him in the right arm and side, knocking the victim to the ground, whereupon appellant shot him again at point blank range. As a result, the victim suffered serious internal injuries, amputation of the right arm above the elbow, and required two major operations with long term care and limited recovery.

30 MJ at 1170.

The defense psychiatrists, Drs. Martin Blinder and Harvey Dondershine, had both examined the accused personally; both believed that, at the time of the offense, the accused suffered from a "severe mental disease or defect"; and both believed that he was unable, at the time, to appreciate the nature and quality or wrongfulness of his acts. Neither witness was asked directly for an opinion of the accused's intent or ability to form one, and neither witness spontaneously offered an opinion directly on that subject. The question is, however, whether the witnesses' testimony trenched upon intent sufficiently that an instruction was nonetheless required.

Not purporting to quote or summarize comprehensively the entirety of the defense experts' extensive testimony, we offer the following selections. Dr. Blinder identified several thought-disruptive conditions, including:

> Post-traumatic Stress Disorder or the post Vietnam syndrome, which in Mr. Berri's case consists of episodic loss of control [5] with anxiety agitation, paranoid thinking, flattened effect, partial loss of commerce with reality, morbid preoccupations, hypervigilance, alcohol abuse and social isolation.

He opined that,

> from a clini—clinical perspective, the severity of his episode that day was such that I can't imagine how he would be very much in touch with the processes necessary for understanding the wrongfulness of one's conduct.

He further diagnosed dissociative episodes and paranoid explosive personality disorder, though he was not asked to elucidate the terms.[6] In the doctor's opinion, these factors, in combination, caused the accused's inability to appreciate the nature and quality or wrongfulness of his acts.

Asked about the duration of a post-traumatic stress disorder episode, the witness observed:

> Usually, acute episodes where the person's commerce with reality is grossly impaired and they engage in conduct which is basically at war with their natural preferences and what they would ordinarily do if they weren't deranged, those episodes rarely last more than 20 minutes maybe 60 minutes at the outside. But the acute episodes of irrational

---

issue. We also find the record insufficient to consider the matter *sua sponte*.

4. We denied the accused's cross-petition for review of an unrelated issue. 32 MJ 203 (1990). Oral argument was heard in this case on March 6; 1991, at Dimick Hall, on board the United States Coast Guard Academy, New London, Connecticut.

5. On government motion, the members were instructed to disregard the reference to the accused's loss of control. *See* Art. 50a(a), UCMJ, 10 USC § 850a(a).

6. *See* American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders (Third Edition–Revised)* 269–77, 321–22 (1987).

rage where they're clearly looney tunes is relatively short-lived....

What the accused's intent might have been while "looney tunes" was the $64 question not asked.

Dr. Dondershine's testimony was more expansive on the subject of the accused's consciousness. His opinion was that the accused

was in a dissociative mental state at the time of the crime and that this was the culmination of a psychiatric decompensation that had probably been going on for months, perhaps close to a year and that what was decompensating were the underlying problems, in part, relating to combat service in Vietnam, specifically the effects of Post-traumatic Stress Disorder.

The witness explained that post-traumatic stress disorder has "been called combat fatigue, shell-shock, traumatic neurosis, traumatic stress disorder, Vietnam syndrome, rape trauma syndrome, lots of different names, but the current name that's been used most commonly is Post-traumatic Stress Disorder and it's a bit different from the usual kind of psychological illness——"

The witness' description of "dissociation" was also extensive.[7] Essentially, he "defined [it] as a state of altered consciousness during which some parts of the mind that normally do not have access to behavior are able to start working autonomously and get access to behavior." "Consciousness" he "defined as the total of one's subjective awareness of what's happening inside one's self and outside one's self."

According to the witness, "a person [normally] has a fundamental sense of what is reality and who they are. In a dissociated mental state, that's not true. The person fragments."[8] Consciousness, as we think of it, is absent; "judgment [is] cut off." Frequently, there is "some amount of amnesia" after a period of dissociation because "the nondissociated personality doesn't always remember everything that happened while dissociated."

"[I]n dissociation," according to the witness,

it's as if these parts [of the brain] separate and ... they stop communicating with each other.... And depending on which part the brain gets access, you can see emotional displays without memory. You can see memory without behavior, that would be hallucination. You can see perception without anything else, in which case, you sometimes see that in DTs when people talk about things crawling on them.

In the accused's case, "some of th[e] layers [of consciousness] were gone." He was aware of much of the conduct, but it was as if he was watching someone else do it.

In the witness' view, the accused

was a person seeing a crystal clear, silent world, observing himself go about doing things with no awareness consciously, internal subjective awareness of what and why it was happening. He knew what he—that he was going to the phone booth and making phone calls, but not its purpose or the content. I think he continued in that quasi dreamlike state, up to and including the moment of shooting where in the instant before there was an actual not super clarity as had been the case, but it twisted the formed image of a small person. I don't think he had any awareness of—of the next five or 10 minutes. At least not

---

7. Dr. Dondershine testified extensively both in a session under Article 39(a), UCMJ, 10 USC § 839(a), and before the members. Several of the quotations that follow are taken from the Article 39(a) session for brevity's sake, where it appears that the testimony before the members was to the same effect but more lengthy.

8. Further, Dr. Dondershine added:
 [The accused] wasn't able to appreciate much of anything because the parts of the mind that appreciated anything if appreciate means anything more than know, were unavailable. They were as if across a moat. So that, he would not see it as an act going on in time with consequences that involved, I—I wouldn't even think he was aware of being angry at the time.
 Everything would be compartmentalized and separated. So he'd be aware of behavior, but he might think it's a dream.

that I could determine and then he has an awareness of almost that of an observer seeing a police car and a policeman drive by and wondering why a policeman would just casually go by a person who is holding a weapon. He was the person holding the weapon and he remembers merely walking, and then being tackled and feeling no pain. Approximately, I imagine a half hour later, he was in a—sitting in a police cell, and at that point, he was—he began to say, I am the person who is now in trouble. I am the one—I am ... in trouble, I did something, the dissociation was over and I think he was back in whatever other psychiatric condition he might have been in, in a situational adjustment reaction or whatever. He started responding....

Further, according to the witness, the accused

is essentially completely amnesic for his own internal mental operations. He's not amnesic for observing the person, the person being Clay Berri go about and do many of the things. But, I think he is amnesic for the mentation, the thinking, motivation, intent and all the things that—that define rational thinking. I think he's also amnesic for particular things. From the moment he took his rifle off rain sling and went to high port, there seems to be about an hour missing. Then, there were gaps in terms of seeing himself at a—at the phone booth, at the ho—at the motel. When I do an inter-

view, I try to get inch-by-inch, moment-to-moment continuity and I kept coming up with gaps. And so, I think some of those gaps were amnesic. So, I think there's a primary amnesia for internal operations and that there is a partial amnesia for actual perceptual events as they occur.

Asked about what the accused "knew" when firing the weapon, the witness responded:

It's a question of what we mean by he. The fragment loading the weapon knows he's loading a weapon.... But that person at the same time can't say, what am I doing, I'm loading a weapon.... Some part—some fragment knew what the behavior was.

(Emphasis added.)

 In summary, Dr. Dondershine spoke about the accused's perception, awareness, knowledge, consciousness,[9] and self-reflection. Like Dr. Blinder, he was not asked about and did not testify about intent.

### III

 Following presentation of the evidence, it became incumbent upon the military judge to fashion instructions to the members to conform to the facts. As in every case, the military judge had to consider:

(1) the elements of proof of each charged offense;

---

9. "Unconsciousness" itself can be asserted as a defense. At common law, lack of unconsciousness was considered part of the *"actus reus,"* the criminal act, because the act had to be "voluntary." According to Glanville Williams:

The law might define an act to mean any bodily movement, but in practice it does not do this. An act is a *voluntary* movement. *Criminal Law: The General Part* § 8 at 11–12 (2d ed.1961)(footnote omitted). And voluntariness implied "consciousness." *Id.* §§ 8 at 13 and 157 at 482–90. *See also* O. Holmes, *The Common Law* 54 (1923); W. LaFave and A. Scott, 1 *Substantive Criminal Law* § 3.2(c) at 275 (1986); Morris, *The Planter's Dream,* 49 U.Chi.L.Rev. 609, 640–45 (1982).

The drafters of the Model Penal Code, *see* § 2.01(2)(b) *Model Penal Code and Commentaries* at 212 (1985), still seem to treat conscious-

ness as an aspect of the *actus reus,* by excluding "a bodily movement during unconsciousness" from the definition of a "voluntary act[ ]." Many jurisdictions, however, regard unconsciousness or automatism as an affirmative defense. Annotation, *Automatism or Unconsciousness as Defense to Criminal Charge,* 27 A.L.R. 4th 1067 (1984).

What the status of unconsciousness might be under the Uniform Code of Military Justice, we do not decide here. Although there was considerable discussion of what the accused may have been conscious of and what consciousness means in a dissociative state, we find even the defense witnesses' testimony too confusing, vague, inconsistent, and off point with regard to the accused's consciousness to raise the defense of unconsciousness.

(2) the elements of proof as to each defense raised by the evidence; and

(3) the respective burdens of proof of each offense and defense.

[4] Regarding the elements of the offenses, the precise question was whether the psychiatric testimony constituted "relevant evidence" tending to make the existence of essential elements of the charged offenses "more probable or less probable." Mil.R.Evid. 401, Manual, *supra*. In other words, does the psychiatric testimony make it "more probable or less probable" that the accused formed the necessary "specific intent" to be found guilty "beyond a reasonable doubt" of the charged offenses?

In particular, each of the charged offenses contains a "specific intent" element. With respect to attempted murder (Charge I), the Government was required to prove *that the act was done with the specific intent to commit a certain offense under the code*, para. 4b(2), Part IV, Manual, *supra*, *i.e., to kill without justification or excuse*. Art. 118, UCMJ, 10 USC § 918; *see* Art. 80, UCMJ, 10 USC § 880, and para. 43b, Part IV, Manual, *supra*. As for maiming (Charge II), the specific-intent element is *that the accused inflicted th[e] injury with an intent to cause some injury to a person*. Para. 50b(3), Part IV, Manual, *supra; see* Art. 124, UCMJ, 10 USC § 924. The specific-intent element of assault intentionally inflicting grievous bodily injury with a loaded firearm is *that the accused, at the time, had the specific intent to inflict grievous bodily harm*. Para. 54b(4)(b), Part IV, Manual, *supra; see* Art. 128, UCMJ, 10 USC § 928.

Regarding defenses, the military judge also had to consider the effect of the psy-chiatric testimony as to any "affirmative" or "special" defenses.[10] Clearly, the accused was seeking an acquittal by reason of his lack of mental responsibility. Article 50a, UCMJ, 10 USC § 850a, establishes:

(a) It is an affirmative defense in a trial by court-martial that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts.

No other defenses such as alibi or self-defense were suggested by the evidence. Thus, the issue that the judge squarely faced was whether to limit the psychiatric testimony to the affirmative defense of lack of mental responsibility or whether the court members could also consider its impact, if any, on the question of "specific intent."

Regarding burdens, it is axiomatic that the Government has the burden of proving each and every element of the offense "beyond a reasonable doubt." RCM 920(e)(5) provides:

(A) The accused must be presumed to be innocent until the accused's guilt is established by legal and competent evidence beyond reasonable doubt;

(B) In the case being considered, if there is a reasonable doubt as to the guilt of the accused, the doubt must be resolved in favor of the accused and the accused must be acquitted.

 Even when the accused interposes the affirmative defense of lack of mental responsibility, the prosecution must still sustain its initial burden of establishing, beyond a reasonable doubt, every element of the offense—including *mens rea*.[11] The

---

10. "Affirmative" and "special" defenses are those "which, although not denying that the accused committed the objective acts constituting the offense charged, denies, wholly or partially, criminal responsibility for those acts." RCM 916(a), and Discussion, Manual for Courts–Martial, United States, 1984.

11. In order to be criminal, the offending conduct must generally be accompanied by "some sort of bad state of mind" (*mens rea*). W. LaFave, *supra*, § 3.1 at 270 (1986). In the in-stant case, the shooting constituted the conduct; possible bad states of mind included the specific intents to shoot, grievously injure, maim, and kill the victim. As always, the factfinder determines whether *mens rea* has been proven. If admissible evidence suggests that the accused, for whatever reason, including mental abnormality, lacked *mens rea*, the factfinder must weigh it along with any evidence to the contrary.

burden of disproving elements of the offense never shifts to the defense.[12] *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

■ Notwithstanding the Government's proof of every element of the offense beyond a reasonable doubt, an accused can be excused from criminal liability if he establishes that he lacked mental responsibility as defined by Article 50a(a). In order to prevail on this affirmative defense, however, the accused must persuade the factfinder of his lack of mental responsibility by "clear and convincing evidence." Art. 50a(b). *See Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).

No other affirmative or special defense, however, entails such a defense burden. Generally, "[o]nce ... [the] defense ... is placed in issue by some evidence, the prosecution shall have the burden of proving beyond a reasonable doubt that the defense did not exist." RCM 916(b). Self-defense is such a defense. *See* RCM 916(e).

Other theories commonly referred to as "defenses" are not "affirmative" or "special" defenses, but simply element rebuttal. Thus, a defense of alibi simply disputes the prosecution's first element—that it was the *accused* who committed the purportedly criminal act. *See United States v. Jones,* 7 MJ 441, 443 n.1 (CMA 1979). When such defenses are advanced, the Government's

burden remains, as always, to prove the elements of the offense beyond a reasonable doubt.

Like the military judge and the Court of Military Review, therefore, we return to the relevance of the psychiatric testimony. As indicated, the judge (relying on *United States v. Pohlot,* 827 F.2d 889 (3d Cir. 1987)) viewed the defense expert testimony as not being relevant to the accused's specific intent; and the Court of Military Review believed otherwise. *See Ellis v. Jacob, supra.*

In a sense, it comes down to philosophy. How precisely can words like "consciousness," "intent," "appreciation," "knowledge," and "awareness" be quantified? Clearly there is overlap. Can a person specifically intend the consequences of his actions if he does not realize (know) what he is doing (*i.e.,* he is unable to appreciate the nature and quality of his acts)? Can he specifically intend results *subconsciously?*

Generally, purpose and cognition are seen in the law as opposite sides of the same coin. § 2.02, *Model Penal Code and Commentaries* 233 (1985); W. LaFave and A. Scott, 1 *Substantive Criminal Law* § 3.5 at 302–18 (1986). Nevertheless, one school of thought maintains that these distinctions can be made, that such states of mind are separable and independent. *See United States v. Pohlot, supra* at 900, 906; Morse, *Undiminished Confusion in Diminished Capacity,* 75 J.Crim.L. & Criminology 24 (1984). The military judge fol-

---

**12.** *United States v. Pohlot,* 827 F.2d 889, 895–903 (3d Cir.1987). In particular, Circuit Judge Becker cites the following comments of Attorney General William French Smith, testifying on what became the Insanity Defense Reform Act of 1984, 18 USC § 20 (later recodified as 18 USC § 17), from which Article 50a(a) is drawn:

the abolition of the insanity defense coupled with the continued admission of psychiatric evidence to negate mens rea:
would abolish the insanity defense to the maximum extent permitted under the Constitution.... Under any approach, the Government will always be required to prove every element of the statutory offense

that is charged. This includes any specific intent or knowledge required by the statute. 827 F.2d at 902.

In addition, Circuit Judge Becker quotes the House Judiciary Committee which considered the legislation for this proposition: By distinguishing the affirmative defense of insanity from the narrow mens rea/mental state requirements, the Committee's approach meets the constitutional requirement that the prosecutor prove all elements beyond a reasonable doubt while placing on the defendant the burden of demonstrating a reason for exculpation that presumes the existence of these elements. 827 F.2d at 903, citing H.R.Rep. No. 577, 98th Cong., 1st Sess. 14 (1983).

lowed this logic. The Court of Military Review, however, took a broader view of relevance.

We agree that, logically, evidence that an accused was unconscious or did not realize what he was doing, etc., might suggest that he did not or could not intend the specific consequences of his actions. In other words, such evidence could tend to make the existence of intent "less probable." Mil.R.Evid. 401. Of course, such a conclusion would depend heavily on the precise nature of the testimony; obviously not all testimony that an accused suffered a mental disease or defect implicates intent.

To be sure, resolution of the issue in this case would have been cleaner if the questioners had used language focusing on intent. However, relevance is not solely dependent on labels, and nothing prevented the prosecution, or the military judge himself, from seeking clarification of the terms. The prosecution might also have contested the defense experts' opinions on the grounds of basis. It may be that the art or science of psychiatry is not capable of rendering a relevant opinion on what a particular person actually intended at a time past or whether the person had the capacity to entertain any particular specific intent. *See* Mil.R.Evid. 702; *Ellis v. Jacob,* 26 MJ at 94; *United States v. Gipson,* 24 MJ 246 (CMA 1987). We express no opinion on this question here. Finally, the prosecution can always fight fire with fire. Given that *mens rea* is an element of the offense, the prosecution is not required to rely on inference to prove it. *See* n. 2, *supra.*

■ In conclusion, we hold that the extensive testimony regarding the accused's mental dysfunction is sufficient, on this record, so that the Court of Military Review was within its prerogative in ruling that the testimony was relevant to specific intent.[13] As a matter of law, we cannot say that the court erred in so ruling. Therefore, the instructions denied the accused the opportunity to advance a legitimate defense theory to the factfinder.

The decision of the United States Coast Guard Court of Military Review ordering a rehearing on the specific-intent offenses is affirmed.

Chief Judge SULLIVAN and Senior Judge EVERETT concur.

---

13. In *Ellis v. Jacob,* 26 MJ 90 (CMA 1988), we relied heavily on *United States v. Pohlot, supra,* for the proposition that psychiatric evidence was not restricted to the affirmative defense of lack of mental responsibility by the Insanity Defense Reform Act, 18 USC § 17, formerly § 20. Rather, we agreed, such testimony can be admissible in appropriate cases on *mens rea.* In the latter part of the *Pohlot* decision, however, the Court of Appeals concluded that the particular testimony before them did not raise the question of intent. 827 F.2d at 906–07. We do not view our opinion today as being inconsistent with that approach.