OPINION OF THE COURT
CARTER, Judge:
A general court-martial composed of officers convicted appellant, contrary to his pleas, of attempted larceny, willfully disobeying a superior commissioned officer (four specifications), violating a lawful general reg *821 ulation (four specifications), larceny (twenty-nine specifications), wrongful appropriation, forgery (four specifications), making or uttering worthless checks without sufficient funds (four specifications), conduct unbecoming an officer and gentleman (twenty-eight specifications), obtaining services under false pretenses, and obstructing justice, in violation of Articles 80, 90, 92, 121, 123, 123a, 133, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 890, 892, 921, 923, 923a, 933, and 934 (1988) [hereinafter UCMJ], The court adjudged a sentence of dismissal, confinement for two years, forfeiture of all pay and allowances, and restriction to the limits of Fort Sam Houston, Texas, for two months. The convening authority disapproved one finding of guilty (larceny) and approved the adjudged sentence except for the restriction. The case is before the court for automatic review under Article 66, UCMJ, 10 U.S.C.A. § 866.
Appellant’s principal assignment of error is that he was not mentally responsible for his misconduct because he suffered from an episodic mood disorder called bipolar disorder, sometimes referred to as manic depression. See American Psychiatric Ass’n, Diagnostic and Statistical Manual op Mental Disorders (4th ed. 1994) (popularly known as DSM-IV). We disagree and affirm.
Facts
At the time of his trial in February 1996, appellant was a career Judge Advocate General’s Corps (JAGC) officer with over twenty years of service. Appellant’s trial with members lasted for seventeen days and generated a 3,000 page verbatim transcript.
While serving in Panama in December 1987, appellant was command referred to the local military hospital mental health service. After sixteen days as an inpatient in the hospital psychiatric ward, he was medically evacuated to Wilford Hall Medical Center in San Antonio, Texas, for more extensive evaluation of a possible bipolar disorder. Appellant was an inpatient in the psychiatric ward at Wilford Hall Medical Center for twelve days. On 8 February 1988, he was discharged from Wilford Hall Medical Center with a diagnosis that appellant’s “behavior is consistent with his baseline personality style which could be informally termed hypomanic (a normal variant)____ It is also likely that his baseline personality style was accentuated by his use of a legal stimulant [diet pills] during the period in question.” Between February 1988 and his trial, appellant was assigned to Fort Sam Houston, Texas, primarily as a legal instructor at the Academy of Health Sciences.
Appellant received an adverse comment in his 1987 Officer Evaluation Report (OER) from his Panama tour: “He was an incessant talker, frequently engaging people in one-way, rambling, irrelevant conversations. Sometimes they were completely incoherent.” As a result of this adverse OER, appellant appeared before an Officer Show Cause Board at Fort Sam Houston, Texas, on 15 November 1991. See 10 U.S.C. §§ 1181-87 (1990). Appellant successfully defended against this elimination action by arguing that his behavior in Panama resulted from a combination of too much stress, too much caffeine, and too many diet pills.
There is no substantial dispute about what appellant did in this case. Between September 1992 and March 1995, appellant obtained approximately $100,000 from more than thirty victims in a complex web of unlawful, fraudulent, or unethical conduct that may be grouped into four categories: (1) unpaid personal loans, (2) fraudulent investment schemes, (3) unauthorized and incomplete legal services, and (4) worthless checks.
Appellant borrowed more than $26,000.00 in personal loans, some of which he secured with forged promissory notes. Appellant received approximately $20,000.00 for legal services that he was not authorized to perform and never completed. Appellant collected almost $30,000.00 in investment schemes for a “honey baked ham” concession at the installation post exchange, season tickets for the San Antonio Spurs professional basketball team, and a land deal. Appellant wrote forty-three worthless checks totaling more than $28,000.00.
Appellant was a gregarious, smooth-talker who successfully played upon the greed of his victims. Appellant’s promises of legal services, at little or no expense, and extraordi *822 narily high investment returns, were usually accepted without question. On several occasions, appellant persuaded his victims to “roll over” their initial investment and “paper profit” into another investment scheme. Problems arose when appellant failed to make the promised payments when these loans, refunds of legal retainer fees, and investment returns became due. When appellant’s misconduct became known to the command, many of the victims were repaid by filing Article 139, UCMJ, claims against appellant.
Appellant was issued mandatory retirement orders, dated 17 November 1993, with an effective date of 31 August 1994. By March 1994, appellant’s commander and command judge advocate began receiving numerous complaints concerning appellant’s misconduct which ultimately evolved into this court-martial. Appellant was counseled about these complaints in March 1994.
In April 1994, appellant requested an expedited retirement physical. He completed a Report of Medical History wherein appellant described his health as “outstanding” and stated that he had never “been treated for a mental condition” or been a patient in any type of hospital. A medical examination conducted on 25 April 1994 found appellant medically fit for retirement without referral to the physical disability evaluation process. On 26 April 1994, appellant submitted a request to move his retirement date forward to 31 May 1994, “due to my father’s health condition and because of the immediate and available job opportunities in Mississippi.” Appellant’s request was not granted.
On 6 May 1994, appellant’s commander referred the complaints against appellant to the Criminal Investigation Command (CID). The original charges in this case were preferred on 2 March 1995. In late 1995, two sanity boards determined that appellant suffered from bipolar disorder; that, at the time of the offenses, he was able to appreciate the nature and quality or the wrongfulness of his acts; and that he possessed sufficient mental capacity to' understand the nature of the proceedings against him and to conduct or cooperate intelligently in his defense. See Rules for Courts-Martial 706 and 909 [hereinafter R.C.M.]. The defense did not challenge at trial, or on this appeal, the determination that appellant possessed the mental capacity to understand the nature of the proceedings and to cooperate intelligently in his defense.[1] Appellant did not testify during the merits or sentencing phases of his court-martial.
The government conceded at trial that, under the facts of this case, appellant’s bipolar disorder qualified as a severe mental disease or defect under Article 50a(a), UCMJ, 10 U.S.C.A. § 850a. The issue contested at trial, and on appeal, is whether appellant, as a result of his bipolar disorder, was “unable to appreciate the nature and quality or the wrongfulness” of his acts at the time of the offenses. UCMJ art. 50a(a) (emphasis added).
Mental Responsibility
After John Hinckley, Jr. was found not mentally responsible for shooting President Reagan, Congress enacted tough, new, substantively identical lack of mental responsibility standards in The Insanity Defense Reform Act of 1984[2] (federal courts) and The *823 Military Justice Amendments of 1986[3] (created a new Article 50a, UCMJ). Article 50a, UCMJ, remains unchanged since it was enacted in 1986:
§ 850. Art. 50a. Defense of lack of mental responsibility
(a) It is an affirmative defense in a trial by court-martial that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts. Mental disease or defect does not otherwise constitute a defense.
(b) The accused has the burden of proving the defense of lack of mental responsibility by clear and convincing evidence.
(emphasis added).
When the President implemented the procedures for this statute, he clarified that the presumption in favor of mental responsibility continues until the accused establishes, by clear and convincing evidence, that he was not mentally responsible at the time of the alleged offense. R.C.M. 916(k)(3)(A). The determination of mental responsibility is a factual issue that must be resolved by the fact finder. The military judge may not decide it as an interlocutory matter. UCMJ art. 51(b); R.C.M. 916(k)(3)(C). This court must also be satisfied that the members’ decision on mental responsibility was correct in law and fact. UCMJ art. 66(e).
Findings of Fact
In determining whether appellant proved, by clear and convincing evidence, the affirmative defense of lack of mental responsibility, we make the following findings of fact under Article 66(c), UCMJ:
1. Appellant committed virtually all of these offenses away from his office. Appellant generally told his legal clients that he was not permitted to perform the needed legal service himself, but that he had a friend or relative who could provide the service. Appellant then usually obtained a retainer cheek for the friend or relative, which was to be returned after the legal work was completed. He would then forge the payee’s signature and cash the check. Appellant sometimes asked for payment in cash and made numerous excuses to avoid giving a receipt.
2. When appellant was pressured to write a refund check to a complaining victim, he initially paid these debts with worthless checks. He frequently forged his wife’s signature rather than sign his own. Appellant wrote his victims eighteen worthless checks, totaling more than $18,000.00, on an account that he knew had been closed since November 1990. When a cheek “bounced” and a victim threatened to report appellant’s misconduct to his command or the police, appellant usually paid the debt in question, often in cash or with a check from another investor or client. Occasionally, appellant begged his victims not to report him because he would lose his retirement.
3. Appellant’s OERs from 1988 until the discovery of these offenses in early 1994 reflect a solid, professional duty performance except for an overweight condition attributed to a knee problem. These OERs do not indicate that appellant failed to understand or follow Health Services Academy rules and training schedules or that he taught his classes in anything but a timely and professional manner. None of these OERs stated anything that would indicate appellant was suffering from any mental impairment or that he was not occupationally fully functional in the academic environment.
*824 4. Unlike most appellants, this appellant was a JAGC officer and an ethics counselor with unique training and experience concerning criminal and ethical offenses, including the consequences for violating them.
5. Appellant’s brother testified that, in December 1994, appellant bragged to him that he could “con anybody into doing what he wanted.”
Expert Testimony in Appellant’s Case
Dr. Raymond Costello testified for the defense as an expert in psychology, forensic psychology, and bipolar disorder. Dr. Costello opined that appellant probably could not appreciate the wrongfulness of his behavior from 1992 through 1994. Dr. Costello acknowledged that if an accused were unaware that his conduct was criminal, there would be no need to conceal it. Dr. Costello was evasive when asked about specific dates when the offenses were committed and admitted that he “didn’t go crime by crime.” He stated that appellant was not capable of appreciating the wrongfulness of his actions “pretty much” the entire period and that he had no “evil intent” or “criminal intent.” He also testified that a bipolar patient “probably knows what’s wrong” but still does it anyway.
On cross-examination, Dr. Costello testified that he was not aware that appellant failed to answer these questions during his psychological testing: (1) “It is all right to get around the law if you don’t actually break it;” (2) “I am not afraid to handle money;” and (3) “I have had periods of days, weeks or months when I couldn’t take care of things because I couldn’t get going.” Dr. Costello stated that appellant’s failure to answer these questions would not change his opinion. On reeross-examination, Dr. Costello reluctantly acknowledged that appellant knew what he was doing was wrong.
Dr. Charles Bowden, appellant’s treating civilian psychiatrist, testified for the defense as an expert in psychiatry, manic depression, and bipolar disorder. He testified that appellant was not aware of the wrongfulness of his acts. Dr. Bowden stated that appellant understood it was illegal to take money from people and not repay them, or to forge documents, but that appellant meant no harm. Dr. Bowden avoided answering questions aimed at identifying specific dates and offenses when appellant couldn’t tell right from wrong.
On cross-examination it was apparent that Dr. Bowden applied the wrong legal standard in reaching his conclusions. He stated, “I was asked to do a medical assessment, and a part of that included questions having to do with issues of culpability, the military equivalent of M’Naghten[4] and similar issues of criminal responsibility.” He concluded his testimony by stating that appellant “lacked substantial mental capacity to conform his conduct to the requirements of the law.” (emphasis added).[5]
Dr. Allen Francis testified for the defense as an expert in psychiatry. Dr. Francis testified that appellant’s actions did not violate appellant’s personal moral code because appellant believed he could deliver on his promises. Dr. Francis generally stated that he could not answer “yes” or “no” regarding whether appellant knew his conduct was wrong on the specific dates of each offense. Dr. Francis’s credibility was diminished when he stated that he couldn’t say whether his opinion would be the same if appellant were charged with murder instead of financial crimes.
Dr. (Lieutenant Commander) Kevin Moore testified for the government as an expert in psychiatry and forensic psychiatry. During a sanity board evaluation, Dr. Moore asked appellant questions about the specific offenses. Appellant responded several times that he was “unable to appreciate the wrongfulness of his behavior” or “unable to appreciate the difference between right and wrong.” Dr. Moore stated these were very unusual responses. Dr. Moore concluded that appellant could appreciate the wrongfulness of his acts at the time of the offenses. *825 The government called two other forensic psychiatrists to support the testimony of Dr. Moore.
The defense recalled Dr. Costello who disagreed with Dr. Moore’s testimony and thought the focus should be on the pattern of behavior, not the specific dates of the offenses. Dr. Costello contradicted his prior testimony by stating that because appellant is bipolar, he can never fully appreciate the wrongfulness of his acts.
Discussion
The Congressionally mandated changes to the defense of lack of mental responsibility intentionally made the successful presentation of this affirmative defense significantly more difficult and limited the impact of expert medical testimony. First, the mental disease or defect must now be “severe.” What constitutes “severe” is not at issue in this case because the government conceded at trial, under the facts of this case, that appellant’s bipolar disorder was severe. As a matter of judicial economy, we accept the government’s concession on this point in this case, but need not, and do not, decide whether bipolar disorder would be a “severe” mental disease or defect in another case.[6]
Second, the degree of impairment resulting from a severe mental disease or defect necessary to establish this affirmative defense has increased significantly from “lacks substantial capacity to appreciate”[7] to being “unable to appreciate.” Accordingly, Dr. Bowden apparently applied the wrong legal standard when he referred to M’Naghten and concluded that appellant “lacked substantial capacity” to conform his conduct to legal requirements.
Third, the focus of the new statute is solely on an accused’s ability to appreciate that his conduct is wrong or the nature and quality of his acts (a cognitive test). It no longer matters whether an accused is able to conform his conduct to the requirements of the law (a volitional test). United States v. Lewis, 34 M.J. 745, 749-50 (N.M.C.M.R.1991). Whether an accused sincerely believes that his conduct is morally justified is not relevant in establishing the affirmative defense, although it may be relevant as a matter in mitigation during sentencing. The testimony of Dr. Costello that appellant had no “evil intent” and of Dr. Francis that appellant’s actions did not violate appellant’s personal moral code, are not relevant to, and do not prove, that he was unable to appreciate the nature and quality or the wrongfulness of his acts.
Finally, the statute shifts the burden of proof to the defense to prove lack of mental responsibility by clear and convincing evidence. This is an extremely unusual and difficult hurdle for the defense. The burden of proof for other affirmative defenses,[8] once a defense is placed in issue by “some” evidence, is on the prosecution to prove beyond a reasonable doubt that the affirmative defense did not exist. United States v. Berri, 33 M.J. 337, 343 (C.M.A.1991); R.C.M. 916(b).[9]
*826 Simply put, the defense in this case failed, by a considerable margin, to carry its burden of proof. None of the defense expert or lay witnesses provided any direct evidence to identify a single specification where appellant’s bipolar disorder made him “unable,” at the time of the offense, to appreciate the nature and quality or the wrongfulness of his acts. Similarly, any reasonable inferences from the defense’s circumstantial evidence were insufficient, even when combined with their direct evidence, to carry the defense’s burden of proof. See R.C.M. 918(c) and the discussion thereto.
As our findings of fact demonstrate, appellant took a number of actions to conceal his misconduct; made numerous statements indicating that he understood what he was doing; and performed his assigned duties in a competent and professional manner. The record as a whole easily persuades us that, while committing these offenses, appellant was able to appreciate the nature, quality, and wrongfulness of his acts.
Appellant argues that, notwithstanding his inability to prove his lack of mental responsibility at the time of any specific offense, he has satisfied his burden because he proved that he was not mentally responsible for significant portions of time “during the period of the charged offenses.” Appellant cites no federal or military cases supporting this argument. The defense expert witnesses all focused on the two and one-half year period covered by these offenses as a whole, rather than on his mental state at the specific times of the charged acts of misconduct. They concluded that appellant was not mentally responsible during significant portions of this period, but could not identify any specific dates. More than twenty defense lay witnesses, many of whom were victims in this case, similarly described appellant’s unusual or bizarre behavior on numerous occasions during this period, but not on the dates of the offenses. On the other hand, none of the victims described unusual or bizarre behavior by appellant during discussions of the transactions underlying the offenses.
While appellant’s “during the period of the charged offenses” argument is novel, it is not the law. The statute creating the defense of lack of mental responsibility specifically requires that the severe mental disease or defect exist “at the time of the commission of the acts constituting the offense.” UCMJ art. 50a; see also United States v. Dubose, 47 M.J. 386, 388 (1998) (“[t]he fact that is determinative of whether appellant met his burden of proof is his inability, at the time of the act, to ‘appreciate the nature and quality of the wrongfulness of the act’ ”); United States v. Young, 43 M.J. 196, 198 (1995) (“whether there is evidence of a lack of mental responsibility at the time appellant committed the charged offenses”); United States v. Massey, 27 M.J. 371, 372 (C.M.A.1989) (accused must convince the fact finder “he was not mentally responsible at the time of the crime”); and United States v. Cartagena-Carrasquillo, 70 F.3d 706, 711-12 (1st Cir.1995) (testimony must establish accused’s state of mind “on the dates of commission of the crimes charged” to be admissible).
Finally, the court notes that the military judge fully instructed the members that appellant’s bipolar disorder may also constitute a partial mental responsibility defense by making him mentally incapable of forming a specific intent, or having the requisite knowledge, or acting willfully, as required by certain charged offenses. We also considered whether appellant’s bipolar disorder negated his ability to form the specific intent, willfulness, or knowledge to commit any of these offenses and find, beyond a reasonable doubt, that it did not. We recognize that the drafters of the MCM (1995 ed.) believe that Article 50a, UCMJ, and R.C.M. 916(k)(2) prohibit the use of partial mental responsibility evidence to negate an ability to form the specific intent required for certain offenses. See MCM (1995 ed.), R.C.M. 916(k) analysis, at A21-62. But see Ellis v. Jacob, 26 M.J. 90, 93 (C.M.A.1988) (Article 50a(a), UCMJ, does not bar admission of partial mental responsibility evidence to negate specific intent of crimes charged); and Berri, 33 M.J. at 344 (holding Coast Guard Court of Military Re *827 view’s decision that military judge erred in failing to instruct members that lack of mental responsibility evidence could negate specific intent crimes was not incorrect as a matter of law, on that record). In any event, appellant’s record of trial provides no basis for relief on this issue.
We have carefully considered appellant’s remaining assignments of error and find them to be without merit. We find that the findings of guilty are correct in law and fact. UCMJ art. 66(e). The findings of guilty and the sentence are affirmed.
Senior Judges TOOMEY and JOHNSTON concur.

. On 10 February 1996, Article 76b was added to the UCMJ. Pub.L. 104-06, 110 Stat. 464. On 27 May 1998, the President signed Executive Order 13086, which implemented Article 76b, UCMJ, by amending R.C.M. 909. These provisions require that an accused who is found incompetent to stand trial be committed to a suitable institution by the U.S. Attorney General under 18 U.S.C. §§ 4241-47 (1997). A new R.C.M. 1102A establishes post-trial hearing procedures to determine whether commitment to a mental institution is appropriate for an accused who is found not guilty by reason of lack of mental responsibility.

. Ch. IV, Pub.L. No. 98-473 § 401-02, 98 Stat. 2057 (1984), codified at 18 U.S.C. § 17. This public law also amended Federal Rule of Evidence 704 by adding a new subsection (b):
No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.
(emphasis added). This new evidence rule was designed to “eliminate the confusing spectacle of
*823 competing expert witnesses testifying to directly contradictory conclusions.” Stephen A. Saltz-BURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL 699 (4th ed. 1986) (citing legislative history). The President decided not to add a corresponding subsection (b) to Military Rule of Evidence 704 [hereinafter Mil.R.Evid.] because ”[t]he statutory qualifications for military court members reduce the risk that military court members will be unduly influenced by the presentation of ultimate opinion testimony from psychiatric experts.” Manual for Courts-Martial, United States [hereinafter MCM] (1995 ed.), Mil.R.Evid 704 analysis, at A22-48. Usually the Federal Rules of Evidence and the Military Rules of Evidence are the same. See Mil.R.Evid. 101(b)(1) and 1102. In this instance, a defendant has greater rights in a military court-martial than in a federal criminal trial.

. Tit. VIII, §§ 801-02, National Defense Authorization Act for Fiscal Year 1987, Pub.L. No. 99-661, 100 Stat. 3905 (1986); see also MCM (1995 ed.), R.C.M. 916(k) analysis, at A21-62.

. M’Naghten’s Case, 10 Cl. & F. 200, 8 Eng. Rep. 718 (H.L.1843).

. Dr. Bowden apparently applied the mental responsibility standard adopted by the MCM (1969 ed.), para. 120(b), in 1980 and abandoned by The Military Justice Amendments of 1986. See discussion hereinafter.

. R.C.M. 706(c)(2)(A) states that the term " 'severe mental disease or defect’ does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, or minor disorders such as nonpsychotic behavior disorders and personality defects.” This definition is consistent with the legislative history for The Insanity Defense Reform Act of 1984. 1984 U.S.C.C.A.N. (98 Stat.) 3411. Some commentators have suggested, prematurely we believe, that the United States Court of Appeals for the Armed Forces has already considered and rejected this definition. See, e.g., Lieutenant Colonel Donna A. Wright, Though this be madness, yet there is method in it: A Practitioner’s Guide to Mental Responsibility and Competency to Stand Trial, Army Law., September 1997, at 20-21.

. In 1977 the United States Court of Military Appeals, following the trend in the federal courts, rejected the M’Naghten plus irresistible impulse standard and adopted a new mental responsibility standard recommended by the American Law Institute’s (ALI) Model Penal Code:
A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law.
United States v. Frederick, 3 M.J. 230, 234 (C.M.A.1977) (emphasis added).

. An accused has the burden of proving mistake of fact as to age in a carnal knowledge prosecution by a preponderance of the evidence. R.C.M. 916(b).

. Shifting the burden of proof to a defendant to prove an insanity defense, by clear and convincing evidence, does not violate due process of law. *826 United States v. Byrd, 834 F.2d 145, 147 (8th Cir.1987); United States v. Amos, 803 F.2d 419, 421-22 (8th Cir.1986); United States v. Freeman, 804 F.2d 1574, 1575-76 (11th Cir.1986).