**UNITED STATES of America**

v.

**James Scott PENDERGRAFT and Michael Spielvogel**

**No. 5:00–CR–21–Oc–10.**

United States District Court, M.D. Florida, Ocala Division.

Oct. 12, 2000.

Jacob A. Rose, The Rose Law Firm, P.A., West Palm Beach, FL, Larry H. Colleton, Larry H. Colleton, P.A., James Scott Pendergraft, Orlando, FL, for James Scott Pendergraft.

Daniel N. Brodersen, Law Offices of Daniel N. Brodersen, Michael Spielvogel, Orlando, FL, for Michael Spielvogel.

Mark Devereaux, U.S. Attorney's Office, Middle District of Florida, Jacksonville, FL, for U.S.

## *ORDER*

HODGES, District Judge.

This case is before the Court on the Government's Combined Motion for Examination of Defendants, Hearing, And Motion in Limine to Exclude Evidence of Defendants' Mental Condition (Doc. 27), and the Defendants' Joint Response (Doc. 33). On September 8, 2000, the United States Magistrate Judge conducted a hearing on this matter during which counsel made extensive argument and the Defendant's expert, Dr. Glen Ross Caddy, testified. Thereafter, the Magistrate Judge prepared a report (Doc. 44) recommending that Government's Motion to Exclude Evidence of the Defendant's Mental Condition (Doc. 27) be Granted.

Defendant Spielvogel has filed objections arguing that the Court should either reject the report and recommendation of the Magistrate Judge or, in the alternative, refrain from ruling on the admissibility of Dr. Caddy's testimony until trial of this action. (Doc. 49).

Upon this Court's independent examination of the file and upon due consideration of the Magistrate Judge's report and recommendation and the Defendant's objections, the report and recommendation (Doc. 44) is adopted, confirmed and made a part hereof. The Government's Motion to Exclude Evidence of Defendant's Mental Condition (Doc. 27) is GRANTED, and the testimony of Dr. Caddy as given before the Magistrate Judge shall not be admissible at trial. The Defendant's request for oral argument on these issues (Doc. 49) is DENIED.

IT IS SO ORDERED.

JONES, United States Magistrate Judge.

## *REPORT AND RECOMMENDATION*

Pending before the court is the Government's Combined Motion For Examination of Defendants, Hearing, And Motion In Limine To Exclude Evidence Of Defendants' Mental Condition ( Doc. 27) and the Defendants' Joint Response (Doc. 33). The Government has also filed a Supplemental Memorandum In Support of Motion In Limine ( Doc. 42). An evidentiary hearing was held on September 8, 2000 during which the Defendant's expert Dr. Glenn Ross Caddy testified.

The Government requests an order excluding the testimony of Dr. Caddy after a hearing on a variety of grounds, or in the alternative, if Dr. Caddy's testimony is permitted an order permitting an examination of Defendant pursuant to Rule 12.2(c) and 18 U.S.C. § 4242 so that the Government's expert can rebut the testimony of Dr. Caddy. After hearing extensive argument from counsel and after evaluating the testimony of Dr. Caddy, for the reasons explained in open court and as detailed below, the Government's Motion In Limine To Exclude the testimony of Dr. Caddy is due to be granted.

## I. *Introduction*

Defendant Spielvogel is charged in this case with several intent crimes including conspiracy to commit extortion and mail fraud, violation of the Hobbs Act, 18 U.S.C. § 1951, knowingly making a false statement to a court of the United States and knowingly making a false statement to the F.B.I.

The Defendant has notified the Government of his intention to introduce the expert testimony of Dr. Ross Caddy, a clinical and forensic psychologist, regarding the personality disorder of Defendant which allegedly effected the Defendant's ability to from the specific intent necessary to commit the crimes charged in the indictment. The Defendant has not filed a notice of his intention to introduce expert testimony relating to mental disease or defect or any other mental condition of the Defendant bearing upon the issue of guilt, as set forth in Rule 12.2(b). Rather, the

Defendant seeks to introduce the testimony of Dr. Caddy to support what Defendant characterizes as a "diminished capacity" defense and not an insanity defense. This evidence, according to the Defendant, goes to the issue of negating specific intent.

## II. *Proposed Testimony of Dr. Caddy*

The Testimony of Dr. Caddy was proffered by the Defendant at the hearing in order for the court to make a determination regarding the breadth and scope of the expert testimony and in order for the Court to determine whether the testimony meets the fundamental standards for admissibility of expert opinion evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) and their progeny.

Dr. Caddy is a clinical and forensic psychologist practicing in South Florida as a licensed clinical psychologist. Dr. Caddy's extensive resume, (*see, attach.Doc. 27*) includes more than 25 years of experience in the field of clinical psychology during which he has extensively taught at various institutions, authored scores of articles, papers and other publications and served as a consultant to various governmental, educational, health and community organizations. Although the Government stipulated to Dr. Caddy's credentials as an expert in the field of clinical psychology the Court requested and Dr. Caddy provided additional information regarding his experience as an expert. Dr. Caddy has testified as an expert in over 500 cases of which approximately twenty percent have been criminal. In most of the criminal cases in which he has provided expert testimony he has testified on behalf of the defendant.

Dr. Caddy was retained to provide a clinical and forensic analysis of the Defendant, Spielvogel, in order to explore any possible causal linkages between issues in Mr. Spielvogel's background, his general psychological functioning and his state of mind during the period of time surrounding the charges in this case. Dr. Caddy conducted both a clinical examination of the Defendant and utilized a forensic analysis in reaching his conclusions. The scope of the work included a comprehensive clinical examination of Mr. Spielvogel lasting in excess of 12 hours, and use of collateral sources to verify the integrity of the information obtained from the examination and testing of Mr. Spielvogel. These external validation procedures included an interview with the defendant's wife, an interview with the co-defendant, Dr. Pendergraft, an interview with a police officer who knows the Defendant and a review of prior psychiatric records of counseling the Defendant underwent five years previously after he separated from his wife. The scope of Dr. Caddy's expert services only included assessment and did not include any counseling.[1]

After completing this investigation[2] Dr. Caddy concluded that Mr. Spielvogel is now suffering from—and was so at the time of the events relevant to his case—an "underlying personality disorder (NOS)[3]." According to Dr. Caddy this personality disorder stems from a fundamental sense of personal inadequacy and limited worth. As a result this personality disorder causes the Defendant to have a chronic propensity to attempt to self aggrandize and to seek to ingratiate himself with people in order to achieve a sense of personal power and worth. Additionally, another aspect of the personality disorder causes the Defendant to be timid and vulnerable to the possibili-

---

**1.** Dr. Caddy's written report can be found as an attachment to Doc. 42.

**2.** Although Dr. Caddy testified that he still had additional work to do he did not believe his diagnosis of personality disorder (NOS)

would significantly change even with the additional work

**3.** (NOS) means "not otherwise specified" in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("DSM–IV").

ty of threat which causes the Defendant to be easily brought to a state of paranoia. Dr. Caddy described the Defendant as "manipulative" and as exhibiting a "pattern of mood swings."

Dr. Caddy described the personality disorder as a composite of various behaviors that do not squarely fall within any of the presently specified DSM–IV listings. Notably, Dr. Caddy has ruled out biopolar disorder as a diagnosis although some of the symptoms for biopolar disorder interface with the behaviors for personality disorder NOS. Further, Dr. Caddy made it clear that he was not of the opinion that the Defendant was insane or suffered from any mental condition which would fall within the definition of insane.

The procedures and methods utilized by Dr. Caddy regarding the forensic analysis were in accordance with recognized practices according to Dr. Caddy. The use of interviews of the Defendant's wife and the co-defendant were valid sources of external validation according to Dr. Caddy even though both interviewees would possibly have a motive for providing information favorable to Mr. Spielvogel. According to Dr. Caddy these procedures are consistent with the ethical guidelines prescribed by the American Psychological Association in its manual on. forensic examination. Mr. Spielvogel's wife was used as a validation source because she has known the Defendant since he was very young. Dr. Caddy did not perceive any problem in interviewing Dr. Pendergraft because he thought Pendergraft would not have a motive to deceive in view of the fact that it could be to Pendergraft's interest to have the jury find Spielvogel as culpable and not Pendergraft. In any event, Dr. Caddy testified that his clinical examination and forensic analysis were "state of the art" and comport in every respect with good clinical and forensic practice.

Regarding the impact the personality disorder would have on someone like Mr. Spielvogel, Dr. Caddy testified as follows. In Dr. Caddy's view the personality disor-

der NOS explains and "accounts" for Mr. Spielvogel's conduct. Notwithstanding the personality disorder, according to Dr. Caddy, the Defendant "could understand the difference between right and wrong." Dr. Caddy opined that the Defendant did "not have control over [these] behaviors." In describing the effect of the personality disorder NOS on the Defendant, Dr. Caddy stated that the Defendant does not have the ability to "self reflect" and does not possess the process for decision making as would a person who does not suffer from personality disorder NOS. In response to questions from the Court Dr. Caddy readily opined that it is the compromise of Defendant's control structures and ability to be self reflective that are lacking and which account for the Defendant's actions.

Although Dr. Caddy did indicate that these behaviors have "deluded" the Defendant from making "judgments about risk" he did not opine that the Defendant suffered from delusions that would be experienced by an individual who is insane. Nor did Dr. Caddy indicate that these behaviors prevented the Defendant from understanding the difference between right and wrong.

## III. *ANALYSIS OF ISSUES*

The Government attacks the testimony of Dr. Caddy on a number of grounds. First, the Government seeks to exclude the testimony on the grounds that Dr. Caddy's opinion is based entirely on hearsay statements of the Defendant and his wife and as such is an attempt to place his version of the facts before the jury under the guise of Rule 803(4) Fed.R.Evid. This Rule provides that statements made to a medical practitioner which form the basis of a diagnosis are not hearsay. According to the Government where the expert is not a treating medical practitioner, as here, but rather a forensic expert brought in to interpret and not diagnose the behavior there is a compelling reason for the Defendant to provide information the Defendant

believes may result in a helpful expert opinion.

Second, the Government, argues that the testimony does not negate criminal intent but is merely an improper attempt to introduce evidence to justify, excuse or explain the Defendant's conduct. This argument is rooted in the analysis that Courts must undertake under *Daubert* and its progeny before expert testimony can be used. As part of this analysis the Government argues that the expert testimony is not reliable, and even if reliable, is not relevant to the issue of *mens rea* and therefore should be excluded under *Daubert*.

The Court will first address the threshold issue of relevance or fit under *Daubert*. Because the Court concludes that the proffered testimony of Dr. Caddy does not satisfy the *Daubert* requirement of relevance it is unnecessary to address the Government's argument regarding the hearsay issues under 803(4) or the other challenges to the content of Dr. Caddy's opinion.

### The Testimony Is Not Relevant To Negate Mens Rea

■ Federal Rule of Evidence 702 as explained by the United States Supreme Court in *Daubert* and in *Kumho* controls determinations regarding the admissibility of expert testimony. Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of specialized expertise to understand the evidence or to determine a fact in issue. *See,* Fed.R.Evid. 702; *Daubert,* 113 S.Ct. at 2794 (holding that "under the [Federal] Rules the trial judge must

ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). In its simplest form under *Daubert* the expert testimony must satisfy two elements. The first prong of *Daubert* asks the Court to assess the knowledge requirement of Fed.R.Evid. 702. This is the reliability assessment and requires the Court to evaluate the methodology used in the expert's analysis. The second prong, referred to as "fit" requires the Court to evaluate the relevance of the evidence or whether the testimony will assist the trier of fact in understanding the issues or determining a fact in issue.

■ The focus of the Government's attack is on the issue of relevance and then secondarily on reliability.[4] Because the issue of relevance is paramount the Court will address that issue as it applies to Dr. Caddy's opinions.

As a back drop to the issue of whether the expert opinion is relevant to the issues the Court must first discuss the context in which the courts have viewed psychiatric testimony. Under The Insanity Defense Reform Act of 1984,18 U.S.C. § 17 all affirmative defenses or excuses based upon mental disease or defect, other than insanity, were eliminated. *See, United States v. Westcott,* 83 F.3d 1354, 1357–8 (11th Cir.), *cert. denied,* 519 U.S. 908, 117 S.Ct. 269, 136 L.Ed.2d 193 (1996). Even though the Act significantly reduced the use of psychiatric testimony outside of the affirmative defense of insanity, it does not completely eliminate it. *See, United States v. Cameron,* 907 F.2d 1051, 1066 (11th Cir.1990). Psychiatric evidence to negate specific intent was not excluded by Congress under the Act. *Id.* That does not mean, however, that psychiatric testimony is admissible simply because the evidence goes to the issue of explaining whether the Defendant lacked the capacity or was incapable of forming the intent necessary for the crime

---

4. As to the issue of Dr. Caddy's qualifications the Government conceded at the hearing that Dr. Caddy was a qualified expert. Notwith-standing this concession the Court independently concludes that Dr. Caddy was qualified to render the opinions expressed.

charged. To answer this question the Court must focus on whether the testimony truly will, if accepted by a jury, negate *mens rea* or rather will only explain or justify the Defendant's conduct.

The Eleventh Circuit counsels that where a defendant claims "lack of capacity" or claims that he was "incapable" of forming the intent necessary for the crime charged "most often that defendant is speaking of an incapacity to reflect or control the behaviors that produced the criminal conduct." *Cameron* at 1066. Relying upon the Third Circuit's discussion of the meaning of *mens rea* in *United States v. Pohlot*, 827 F.2d 889, 906 (3rd Cir.1987), the Eleventh Circuit observed that "[e]vidence offered as 'psychiatric evidence to negate specific intent' often focuses not on a defendant's specific intent at the time the offense was committed, but on the defendant's 'awareness' of intent and whether the defendant was fully reflective or in control of her unconscious motivations." *Cameron* at 1066.The compromise of the usual control structures does not negate mens rea. According to the Eleventh Circuit in *Cameron* where there is"[a] lack of conscious self-reflection [it] does not mean a lack of intent and therefore does not negate mens rea." *Id.* at 1066 n. 30 (quoting *Pohlot*, 827 F.2d at 906).

Turning to the expert testimony in the instant case, Dr. Caddy testified that the Defendant was not insane or even close to being legally insane but instead suffered from an underlying personality disorder NOS. According to Dr. Caddy this condition did not prevent the Defendant from understanding the difference between right or wrong. Rather the amalgam of behaviors which comprise the personality disorder caused Defendant to lack the self reflective mechanisms to control the behaviors. It does not mean that the Defendant lacked the intent to commit the

crimes charged. As such, the testimony of Dr. Caddy, even if deemed reliable and even if accepted by a jury, does not negate *mens rea.* Because the testimony does not negate *mens rea* the expert testimony does not satisfy the "fit" or relevance prong of *Daubert* and Rule 702 and, therefore, the Defendant should not be permitted to use the testimony of Dr. Caddy because it will not be relevant in assisting the jury in determining a fact in issue.

The testimony of Dr. Caddy even viewed in the best light provides evidence of justification or excuse for the Defendant's actions and does not show or prove the lack of Defendant's intent. Defendant's behaviors of self aggrandizement, a desire to ingratiate himself to others and his fear to the point of paranoia are not behaviors that demonstrate Defendant did not know that he was submitting a false affidavit to the Court or to the F.B.I. or that the affidavit was submitted to extort a settlement for his benefit. *See, United States v. Baxt*, 74 F.Supp.2d 436, 442 (D.N.J.1999)(impulse for grandiosity or poor judgement does not negate mens rea). In sum, the testimony of Dr. Caddy simply does not demonstrate that the conduct of Defendant alleged in the indictment was less than purposeful.[5]

A justification defense based on psychiatric testimony, as here, presents an inherent danger "that it will distract the jury from focusing on the actual presence or absence of mens rea" and "may easily slide into wider usage that opens up the jury to theories of defense more akin to justification." *Cameron* at 1067. That is the case here and, accordingly, the Government's motion to exclude the testimony of Dr. Caddy is due to be granted.

## IV. *RECOMMENDATION*[6]

Based on the foregoing reasons, it is respectfully **RECOMMENDED** that the

---

**5.** Because the Court concludes that the expert testimony of Dr. Caddy is not relevant to negate *mens rea* the Court does not need to

consider whether the testimony is or is not reliable under the first prong of *Daubert.*

**6.** Specific, written objections may be filed in accordance with 28 U.S.C. § 636, and Rule

Government's Motion To Exclude Evidence of Defendant's Mental Condition (Doc. 27) be **GRANTED**.

6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.